|  |  |  |
|---|---|---|
| JAMES COTHAM, PATRICIA COTHAM, and ERIN PATRICE DANIEL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:08-1022 |
| | ) | JUDGE ECHOLS |
| CHRIS DAVIS (Humphreys County Sheriff), TIMOTHY HEDGE (Humphreys County Deputy Sheriff), CARLOS HOGAN (Humphreys County Deputy Sheriff), and HUMPHREYS COUNTY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Defendants Sheriff Chris Davis ("Sheriff Davis"), Deputy Timothy Hedge ("Deputy Hedge"), Deputy Carlos Hogan ("Deputy Hogan") and Humphreys County ("the County") filed a Motion for Summary Judgment (Docket Entry No. 12), to which Plaintiff James Cotham ("Mr. Cotham"), his wife, Plaintiff Patricia Cotham ("Mrs. Cotham"), and their daughter, Plaintiff Erin Patrice Daniel ("Ms. Daniel") filed a response in opposition (Docket Entry No. 18), and Defendants filed a reply (Docket Entry No. 19).

This is a civil rights case brought by the Plaintiffs under 42 U.S.C. § 1983 alleging violation of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs seek compensatory and punitive damages, as well as reasonable attorney's fees, costs, and expenses.

1

# I. <u>FACTS</u>

On October 20, 2007, Mrs. Cotham and Keith Neely ("Mr. Neely") helped Mr. Cotham tear down the Old Clydeton Dock. Mr. Neely assisted only part of the day. About 4 p.m., all three of them went to the Cothams' house at 854 Chambers Springs Road. Shortly before dusk, Mr. Neely and Mrs. Cotham left in Mr. Neely's truck to pick up a pizza.

On the way back, at approximately 7:30 p.m., the truck hit a tree about a quarter mile from the Cothams' residence. Mrs. Cotham was injured in the accident. Mr. Neely called Mr. Cotham and told him to come to the scene and get his wife. Within two to three minutes, Mr. Cotham arrived at the scene of the accident. En route to the accident scene, Mr. Cotham called Ms. Daniel to come to the Cotham house to care for the minor children.

When Mr. Cotham arrived at the accident scene, there were several people at the scene who lived in the home across the road from the accident. Mrs. Cotham was sitting in the middle of the road, bloody, and crying hysterically. Mr. Neely and the people at the scene helped Mr. Cotham place his wife in his truck. Mr. Cotham then took his wife to a nearby emergency room. (Docket Entry No. 12-5, James Cotham Depo. at 28-29, 31.)

The Cothams reported the accident upon reaching the emergency room. Mrs. Cotham's injuries included a nearly-severed big toe on her right foot, head injuries and a hyper-extended left foot. The right foot injury required re-attachment of the toe by sutures. Mrs. Cotham received a shot of morphine to prepare her for the suturing procedure. (Docket Entry No. 18-3, Patricia Cotham Aff. ¶¶ 3, 13; Docket Entry No. 18-2, James Cotham Aff. ¶¶ 2, 4, 6-9.)

Meanwhile, Deputies Hedge and Hogan arrived in separate cars at the scene of the accident. A small Nissan truck was crashed into a tree, but there was no one around. The vehicle had left the

2

roadway, rode the ditch line for quite some distance, then crashed into a tree. Deputy Hedge looked inside the truck and saw miscellaneous items, including numerous beer cans, on the floorboards. He smelled alcohol. It was dark, but he did not recall seeing any blood in the vehicle. Deputy Hedge ran a check on the license plate of the truck and it came back to Mr. Neely at an address on East Little Richland Creek Road. One of the deputies called the hospital emergency room, or the emergency room called the sheriff's office. At any rate, the deputies knew someone was in the emergency room that had been hurt in an accident. Deputy Hedge sent Deputy Hogan to the hospital to investigate while he called a wrecker to remove the truck from the scene. (Docket Entry No. 12-7, Hedge Depo. at 5-7, 22, 31.)

While Deputy Hedge remained with the wrecked truck, Mr. Neely's mother came to the accident scene. The road was partly blocked, so Deputy Hedge stopped her. He asked her if she lived in the area. She told him no, but her son had just called her from the Cotham residence. He told her he had been involved in a car crash on Chambers Springs Road and he needed her to come pick him up. Deputy Hedge testified that Mr. Neely's mother "pretty much verified to me that her son was the driver[,]" and the truck license tag came back to him, so "add two and two together, and pretty much he is probably going to be the driver." (Id. at 22.) Deputy Hedge told her that he was the only officer on the scene and could not leave, but that if she went to the Cotham residence and Mr. Neely was there, she was to stay there with him because Deputy Hedge would be going to the residence, or if they decided to leave, she was to return Mr. Neely immediately to the accident scene. (Id. at 7-9.)

Deputy Hogan went to the hospital emergency room to investigate further. He testified that medical personnel were working on Mrs. Cotham and he did not speak to her in the emergency

room. He was able to obtain only general information from a nurse. He left and planned to come back when they finished because he assumed Mrs. Cotham was going to be there for awhile. He also did not recall having any conversation with Mr. Cotham at the hospital. (Docket Entry No. 12-8, Hogan Depo. at 8-9.)

Mr. and Mrs. Cotham dispute Deputy Hogan's account, and the Court must accept the Cothams' version as true for purposes of summary judgment. They claim that, as the doctor began to reattach Mrs. Cotham's toe, Deputy Hogan asked Mrs. Cotham questions about the accident, including who was driving the vehicle and where that person was at that time. Mrs. Cotham told Deputy Hogan that Mr. Neely was the driver of the truck and she was a passenger. She told him that Mr. Neely was not drinking or taking drugs, and she did not know where Mr. Neely was located. Mr. Cotham asked Deputy Hogan if he could refrain from asking his wife any more questions right then because she was in tremendous pain. Deputy Hogan replied that he needed to get information, so Mrs. Cotham held up her hospital arm band and Deputy Hogan got her address and other information from the arm band. Deputy Hogan then left the hospital. (Patricia Cotham Aff. ¶¶ 9-11; James Cotham Aff. ¶¶ 10-11; James Cotham Depo. at 34-35.)

The Cothams were in the emergency room for approximately two (2) hours. Medical personnel gave Mrs. Cotham two Lortab pills for pain and some Phenergan for nausea to take at home. Upon returning home, Mrs. Cotham was under the influence of narcotics and incoherent. Mr. Cotham and Ms. Daniel carried Mrs. Cotham into the house because she could not walk. They undressed her and placed her in bed with ice packs. Mrs. Cotham took the two Lortab tablets and the Phenergan she was given at the emergency room and went to sleep. (Patricia Cotham Aff. ¶¶

4

14-15; James Cotham Aff. ¶ 13; James Cotham Depo. at 37-38; Docket Entry No. 18-1, Erin Daniel Aff. ¶¶ 6-7.)

Ms. Daniel then informed Mr. Cotham that the police had been to the house looking for Mr. Neely and that they had wanted to search the house. She did not give them permission to search because it was not her house, they did not have a warrant, and she would not permit a search without Mr. Cotham present. (James Cotham Aff. ¶ 14; Erin Daniel Aff. ¶¶ 3-5.)

Mrs. Cotham denies that she, Mr. Neely or Mr. Cotham consumed alcohol or that any alcohol was purchased prior to the accident. She did not observe any beer cans or alcoholic beverage containers in Mr. Neely's truck. Mrs. Cotham averred that the right front tire of the truck came off the rim, which caused the truck to veer off the roadway and hit a tree.[1] (Patricia Cotham Aff. ¶¶ 2-7.) Mr. Cotham also testified that Mr. Neely did not drink alcohol or use drugs before he took Mrs. Cotham to get a pizza. (James Cotham Depo. at 36.)

According to the Plaintiffs, approximately thirty (30) minutes after the Cothams arrived home, Deputies Hogan and Hedge arrived at the house to question Mrs. Cotham about the accident and to ask whether Mr. Neely was at the residence. Mr. Cotham and Ms. Daniel told the deputies that Mr. Neely was not there and the deputies could not question Mrs. Cotham because she was heavily medicated and asleep. They also described her injuries to the deputies. Mr. Cotham asked Deputy Hedge if his wife was under arrest, and he answered, "No." Mr. Cotham told Deputy Hedge

---

[1]Mrs. Cotham testified she heard this from witnesses at the scene of the accident who told her the tire had come off the rim and the tire rolled down the road a little bit. (Patricia Cotham Depo. at 20.) Mr. Cotham testified that Mr. Neely later apologized to him for his wife's injuries and said the accident was not his fault because the tire came off his truck, he could not control the truck, and he hit a tree. (James Cotham Depo. at 32.) Other than this hearsay testimony, there is no evidence in the record about what caused the accident.

that if he wanted to question Mrs. Cotham further it could be done at a later time and that she had already been questioned at the hospital.  Mr. Cotham also stated the deputies could not search the home without a warrant.  (James Cotham Aff. ¶¶ 15-16.)

Mr. Cotham attests that Deputy Hedge was very intimidating when he asked one more time if he could question Mrs. Cotham.  Mr. Cotham told Deputy Hedge that he could not question her that night unless he had a warrant.  Deputy Hedge stated that he would be back with a warrant.  (Id. ¶ 17.)  The deputies then left the Cotham home.  Shortly thereafter, Ms. Daniel returned to her own apartment in Waverly.  (Erin Daniel Aff. ¶ 12.)

While the Court accepts the Plaintiffs' version of the facts as true, as the Court must in ruling on a motion for summary judgment, the Court notes that Deputy Hedge provided a different account of the events.  He testified that, by the time the truck was removed from the accident scene, Deputy Hogan had returned to the accident scene from the hospital.  The two deputies went to the Cotham residence.  Deputy Hedge knocked on the door and Ms. Daniel answered.  He asked if she lived there, and she said she did.  Then Mr. Cotham came to the door and identified himself.[2]  Deputy Hedge asked if Mr. Neely was there, and Mr. Cotham answered that he was not, but that he had been there earlier in the day.  Deputy Hedge asked if they had any knowledge of the wreck, and Mr. Cotham explained he had just returned from the hospital with his wife, and she was in bed.  Deputy Hedge asked if he could speak to Mrs. Cotham, and both Mr. Cotham and Ms. Daniel answered, "Absolutely not."  Ms. Daniel stated, "You are not going to disturb my mother."  Deputy Hedge told

---

[2]By Deputy Hedge's testimony, the deputies went to the Cotham residence only once before getting arrest warrants.  According to Ms. Daniel's testimony, the deputies went to the house once while she was there alone and then again later after the Cothams returned.  For summary judgment purposes, the Court must take as true that the deputies went to the Cotham residence twice before they sought arrest warrants.

6

Mr. Cotham he was trying to investigate a crash in which Mrs. Cotham was involved as either the driver or the passenger, he did not know which, and he wanted to get her side of the story about what took place. Mr. Cotham stated Deputy Hedge was not coming in. Deputy Hedge replied, "Okay, then I will have to go get a warrant." Mr. Cotham responded, "Go get your f----ing warrant," and then he slammed the door in Deputy Hedge's face. Deputy Hedge contacted dispatch and told them to call the judicial commissioner and have him go to the sheriff's office. (Hedge Depo. at 9-10.)

Deputy Hedge and Deputy Hogan went to the address at East Little Richland Creek Road to see if Mr. Neely was there.[3] A man Deputy Hedge assumed to be Mr. Neely's father came out on the porch. Deputy Hedge asked if he knew where Mr. Neely's mom was, and he said, "No, she is not here." They continued to converse and Deputy Hedge asked the man when his wife would be back. The man stated he had no idea when she would be back. About that time, Mr. Neely's mother walked out the door of the house. Deputy Hedge asked her if she picked up her son, and she said she did. He asked if she just completely disregarded what he had told her about bringing Mr. Neely back to the accident scene. She stated she chose to leave and she dropped Mr. Neely off somewhere and she would not say where. Deputy Hedge asked for permission to search their house and they gave him consent to search, but they volunteered that he would not find Mr. Neely there. Deputy Hedge did not search the house because "[u]sually when people tell you that they are not going to be there anyway." (Id. at 12.)

---

[3]Deputy Hedge also testified he could not remember if the deputies went to the Cotham residence first or the East Little Richland Creek Road address first. (Hedge Depo. at 17-18.) Deputy Hogan testified he recalled they went to the East Little Richland Creek Road address first and then to the Cotham residence. (Hogan Depo. at 12-13.)

7

The deputies returned to the Sheriff's Office and spoke to Judicial Commissioner John Brennan about what had taken place and the reason why Deputy Hedge was looking for Mr. Neely. According to Deputy Hedge, "state law says I have four hours if I suspect there's probable cause of alcohol that's been involved in an accident." (Id. at 12.) Because someone was injured in the accident, Deputy Hedge wanted to place Mr. Neely under arrest for DUI. (Id.) Deputy Hedge told the judicial commissioner that he felt Mr. Neely was possibly still at the Cotham residence, and he needed to speak to Mrs. Cotham about the accident. He explained the deputies were refused entry into the Cotham residence and Mr. Cotham said they would have to "go get our f—ing warrant, and that was why I was there to get a warrant for obstruction of justice for impeding an investigation." (Id. at 13.) The record does not reflect what Deputy Hedge told the judicial commissioner specifically about Ms. Daniel to obtain an arrest warrant for her. At his deposition, Deputy Hedge explained that he sought an arrest warrant for obstruction of justice against Ms. Daniel because she told him she lived at the Cotham residence when she did not and she refused him entry to the Cotham house.[4] (Id. at 29.) The judicial commissioner issued arrest warrants for obstruction of justice for James Cotham and Erin Daniel.

When asked at his deposition why he thought Mr. Neely was still at the Cothams' residence, Deputy Hedge said: "I don't take a lot of heed into what pretty much anybody tells me until I find out for myself to be otherwise." (Id. at 13.) When asked why he didn't get a search warrant for Mr. Neely, Deputy Hedge testified:

> Because when we go to serve a warrant such as that, I knew I would be placing Mr. Neely under arrest, okay, and I am going to do a safety sweep of the house to insure

---

[4]It is unclear from the testimony when Deputy Hedge learned that Ms. Daniel lived at an apartment in Waverly and not at the Cothams' residence.

8

that there is nobody hiding around the corner. We did that when we entered the residence, and there was no one in the house.

Q. Well, . . . are you saying that it was inappropriate for Mr. Cotham to refuse you entry to his house?

A. No. You said that. I wouldn't allow law enforcement in my house either unless they had a warrant.

\* \* \*

Q. But all the information was that Mr. Cotham was not involved in this accident; correct?

A. To my knowledge at the time I didn't know who was involved in the wreck.

(Id. at 14.) Deputy Hedge confirmed that Mr. Cotham had done nothing in his presence except refuse the deputies entry to his house. (Id. at 15.) He also confirmed that Mr. Cotham and Ms. Daniel told him that Mrs. Cotham had been injured in the accident and they had just returned from the emergency room, but he denied that Mr. Cotham and Ms. Daniel told him that Mrs. Cotham was heavily medicated. (Id.) He recalled they told him Mrs. Cotham was in bed asleep and she had an injury to her toe. Deputy Hedge thought Mr. Cotham was being untruthful about whether Mr. Neely was there because Mr. Cotham told him Mr. Neely had been there earlier in the day, but he had left. (Id. at 17.) Deputy Hogan also believed that Mr. Cotham was lying about whether Mr. Neely was in the house, but at his deposition he also recognized Mr. Cotham had a right to refuse law enforcement entry without a warrant. (Hogan Depo. at 14-15, 24.)

Around 11:00 p.m., Mr. Cotham heard vehicles pulling into his driveway, but he saw no headlights. There was a knock at the door. He opened the door to three deputies, Hogan, Hedge and one whose name Mr. Cotham does not know. Deputy Hedge asked Mr. Cotham to step outside. Mr. Cotham asked why, and the deputies angrily pushed their way into the home and threw Mr. Cotham

9

up against the wall beside the front door and handcuffed him. They told Mr. Cotham he was under arrest for obstruction of justice. Mr. Cotham was not shown a warrant, and he was placed in a police car. Once he was in the police car, four deputies entered his home, Hogan, Hedge, Jackson and one whose name he did not know. (James Cotham Aff. ¶¶ 18-19.)

Mrs. Cotham avers that she was awakened in her bedroom by Deputy Hedge. He told her that this could have been avoided if her husband had let him talk to her earlier. There were three or four deputies going through the house while Deputy Hedge questioned her about the wreck. He wanted to know where Mr. Neely was and if he had been drinking. Mrs. Cotham told Deputy Hedge that she had not seen Mr. Neely since the wreck and he had not been drinking. Deputy Hedge then entered the room of her son, Travis, and asked him about Mr. Neely. Deputy Hedge returned to Mrs. Cotham's room and asked what apartment Ms. Daniel lived in at Whispering Oaks. She told him building F, but she was unsure of the apartment number. Deputy Hedge informed her that Mr. Cotham had been arrested for obstruction of justice and that his bond would be $2,000.00. Mrs. Cotham asked him to bring her a phone, but he informed her they were leaving and they would lock the door on the way out. During this time, Mrs. Cotham was nude, covered only by the sheet and a blanket, which was embarrassing to her. (Patricia Cotham Aff. ¶¶ 16-25.)

Deputy Hedge's version of Mr. Cotham's arrest varies from Plaintiffs' version, although the Court will accept as true Plaintiffs' version of the event. Deputy Hedge testified that when he knocked on the door and told Mr. Cotham he had a warrant for his arrest, Mr. Cotham "commenced on shutting the door in my face. I pushed my way through, through the door, got Mr. Cotham by his right arm, got one cuff placed on him." (Hedge Depo. at 19.) About that time, Mr. Cotham

10

pulled away and resisted placement of the other handcuff. That's when Deputy Hedge put Mr. Cotham up against the wall right by the door, and placed the second handcuff on him.

Deputies Hedge and Hogan then "went through the house." (Id. at 20.) They performed a "safety sweep to ensure that there [was] no one hiding behind the corner that [was] going to come out on us." (Id.) They went back into the bedroom, where Mrs. Cotham was in bed with covers over her and all you could see was part of her head and her foot propped up on a pillow with a bandage. Deputy Hedge "hollered" at her two or three times, "Ms. Cotham, Ms. Cotham," but there was no response. The deputies were in the bedroom no more than ten or fifteen seconds. Then they put Mr. Cotham in the back of a patrol car and went to Ms. Daniel's apartment to arrest her. (Id. at 20.)


While the other deputies went to the door of Ms. Daniel's apartment, Deputy Jackson opened the door to the police car that Mr. Cotham was riding in and asked him if he knew what was going on because Deputy Jackson was confused about what they were doing at the Cotham house and at Ms. Daniel's apartment. Deputy Jackson then told Mr. Cotham that all he knew was that he was told to hide behind the shed in Mr. Cotham's backyard. (James Cotham Aff. ¶ 19.)

Ms. Daniel heard a knock at the door of her apartment. Her roommate went to answer the door. Ms. Daniel got dressed and went to the door, where she saw four officers standing outside her apartment. She could not say for sure that the officer who spoke to her was the same officer she saw earlier in the evening at the Cotham residence. She assumed the officers' presence at her apartment was connected to the earlier incident because when the officers left the Cotham residence, their attitude was, "We'll be back." The officer asked if she was Erin Daniel and she said yes. There was some additional "back and forth," and then the officer pulled Ms. Daniel out of the apartment and

11

put handcuffs on her. He told her "this all could have been avoided had you just let me speak to your mother." Ms. Daniel's roommate handed shoes to Ms. Daniel, who was barefoot. After Ms. Daniel was handcuffed, the officers went into her living room and dining room. Ms. Daniel had not had any previous interaction with the officers around town, except for an "insurance ticket," because she tried "to keep [her] nose clean." When the officers came out of the apartment, Ms. Daniel was taken to a patrol car. She saw Mr. Cotham in a different patrol car. Ms. Daniel denies that she impeded or resisted any stop, frisk, halt, arrest or search or that she obstructed service of any legal writ or process.[5] (Docket Entry No. 12-6, Erin Daniel Depo. at 42-43; Erin Daniel Aff. ¶¶ 15-19.)

Mr. Cotham and Ms. Daniel were taken to the local jail where they were booked on charges. While they were being booked, a friend of Mr. Cotham's arrived with a bail bondsman. Deputy Hedge told Mr. Cotham that he was also being charged with resisting arrest and his total bond would be $6,000.00. Deputy Hedge also stated that Mr. Cotham's charges could have been avoided if he had just let them search his home and question his wife.[6] Mr. Cotham obtained bond for himself and Ms. Daniel for $800.00 cash paid to the bondsman. (James Cotham Aff. ¶¶ 20-22.)

The record does not contain a copy of the initial arrest warrant for Mr. Cotham on the charge of obstruction of justice. The record contains only an arrest warrant for Mr. Cotham for resisting

---

[5]Deputy Hedge testified that Ms. Daniel stepped out of the apartment onto a landing, and he told her he had a warrant for her arrest for obstruction of justice. "I said let's go to the jail." (Hedge Depo. at 27.) Ms. Daniel asked, "[D]o you mind if I get my shoes," and he answered, "Don't mind a bit in the world." (Id.) She stepped back in the apartment, slipped on her shoes, and came back out. She was non-combative, and he put handcuffs on her. (Id. at 28-29.) He denied that any officer entered her apartment. (Id. at 29.)

[6]Deputy Hedge denied making such a statement to Mr. Cotham. (Hedge Depo. at 21.)

12

arrest. (Docket Entry No. 12-1.) Mr. Cotham testified that he did not see an arrest warrant until he was at the sheriff's office. Officers went in and sat down with the magistrate, and they came back out and read him a warrant. They told him he was arrested for obstruction of justice. (James Cotham Depo. at 52.) Approximately fifteen to twenty minutes later, a bail bondsman came to find out what his bond was going to be. When the officers saw the bail bondsman, they went back to the magistrate a second time and came out of the office with a new charge of resisting arrest. According to Mr. Cotham, the resisting arrest charge did not come about until the officers saw that Mr. Cotham was going to make bond. (Id. at 52-53.)

The arrest warrant for Mr. Cotham that is included in the record stated in the "Affidavit of Complaint":

> I, the affiant named below, after being sworn, state under oath that on or about 20 Oct. 07 in Humphreys County, Tennessee, James R. Cotham committed the offense(s) of violation(s) of TCA 39-16-602 Resisting Arrest. I further state under oath that the essential facts constituting the offense(s), the sources of my information and the reasons why this information is believable and reliable are as follows:

> The Defendant did resist arrest when police attempted to arrest him for obstruction of justice.

The Affidavit of Complaint was signed by Deputy Hedge. Judicial Commissioner Brennan made a determination, based on the Affidavit of Complaint, that there was probable cause to believe that Mr. Cotham violated "TCA 39-16-602 Resisting Arrest." (Docket Entry No. 12-1.)

The arrest warrant for Ms. Daniel stated in the "Affidavit of Complaint":

> I, the affiant named below, after being sworn, state under oath that on or about 20 Oct. 07 in Humphreys County, Tennessee, Erin P. Daniel committed the offense(s) of violation(s) of TCA 39-16-602 Obstruction of Justice. I further state under oath that the essential facts constituting the offense(s), the sources of my information and the reasons why this information is believable and reliable are as follows:

13

> The Defendant refused to admit police into her home to talk to her mother who had just returned from the hospital after being in an auto accident. She stated police could not come in to talk to her mother.

The Affidavit of Complaint was signed by Deputy Hedge. Judicial Commissioner Brennan made a determination, based on the Affidavit of Complaint, that there was probable cause to believe that Ms. Daniel violated "TCA 39-16-602 Obstruction of Justice." (Docket Entry No. 12-2.)

On the following Monday morning, Mr. Cotham went to the Sheriff's Department to talk to Sheriff Davis about the arrests. Mr. Cotham told Sheriff Davis of the events of October 20, 2007, showed him photographs of his wife's injuries, and expressed his feelings about how they were treated by his deputies. Sheriff Davis said that he would speak to his officers about the incident and phone Mr. Cotham back. Mr. Cotham waited three days and did not receive a call from Sheriff Davis, so Mr. Cotham called Sheriff Davis. Sheriff Davis told Mr. Cotham that Deputy Hedge was not in the office and that Sheriff Davis would contact Mr. Cotham as soon as possible about the matter. Mr. Cotham never did receive a phone call from Sheriff Davis. (James Cotham Aff. ¶¶ 23-24.)

Mr. Cotham's initial court appearance was the following Friday. The charges were read and a new court date of January 3, 2008 was set. On January 3, 2008, Mr. and Mrs. Cotham and Ms. Daniel went to court and were told that they could speak to the District Attorney, Lisa Duncan, about settling the case. They met with Ms. Duncan, explained the events that took place on October 20, 2007, and showed her the photographs of Mrs. Cotham's injuries. Mr. Cotham told Ms. Duncan that he thought his Fourth Amendment rights were violated and that he would like the charges against Ms. Daniel and himself dropped. Ms. Duncan did not ask him about the case, but after letting them finish speaking, she asked them to wait while she talked to Sheriff Davis. The Plaintiffs

waited approximately two hours.  Ms. Duncan then told them that all the charges were dropped and that they were free to go.  (Id. ¶¶ 25-27.)

As the Plaintiffs were leaving the courthouse, Sheriff Davis stopped Mr. Cotham and apologized for what happened.  He stated he spoke to the District Attorney and had the charges dropped and he was sorry because he meant to take care of the matter before it went as far as it did.  During the conversation, Mr. Cotham again explained what he had been through.  Sheriff Davis said he was not aware that his officers did not have a warrant when they entered the Cotham home.  He also indicated he was not aware of a lot of details that took place during the incident.  Sheriff Davis said that all he wanted to do was to "make this thing right."  Mr. Cotham asked what Sheriff Davis had done concerning the conduct of his officers, and Sheriff Davis said that he "chewed them out."  Mr. Cotham denies that at any time he impeded or resisted a stop, frisk, halt, arrest or search, or that he obstructed service of a legal writ or process.  (Id. ¶¶ 28-31.)  Mr. Cotham had not had any prior problems with Sheriff Davis or the deputies involved in the October 20, 2007 incident.  (James Cotham Depo. at 20).

Humphreys County Executive Jaycee Rawlings testified that the Humphreys County Sheriff is the policymaker for the Sheriff's Department and neither the County Executive nor the County Commission direct the Sheriff as to how he is to make policy.  (Docket Entry No. 18-6, Rawlings Depo. at 4.)  Sheriff Davis testified that he has ultimate supervision of all county deputies.  In 2007, the Sheriff's Department did not have a written policy manual.  (Docket Entry No. 18-4, Davis Depo. at 11-13.)

15

## II.  <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

16

### III. ANALYSIS

To prove a violation of 42 U.S.C. § 1983, Plaintiffs must establish that a person acting under color of state law deprived them of a right secured by the Constitution or the laws of the United States. Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005).

**A. No cause of action under the Fourteenth Amendment**

Defendants first contend that Plaintiffs' § 1983 claims must be analyzed under the Fourth Amendment, and not under the Fourteenth Amendment. See Albright v. Oliver, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims'"); Humes v. Gilless, 154 F.Supp.2d 1353, 1359 (W.D. Tenn. 2001) (dismissing § 1983 claim as cause of action under Fourteenth Amendment because plaintiffs alleged sufficient facts to trigger the Fourth Amendment). Plaintiffs agree this law governs. Consequently, Defendants are entitled to summary judgment on Plaintiffs' § 1983 claims under the Fourteenth Amendment to the extent the claims are based on substantive due process.

**B. No cause of action under the Fifth Amendment**

Although Plaintiffs allege that the Defendants' actions violated their rights under the Fifth Amendment, the Due Process Clause of the Fifth Amendment circumscribes only the actions of federal government agents. See Scott v. Clay County, Tennessee, 205 F.3d 867, 873 n.8 (6th Cir. 2000); Sturgell v. Creasy, 640 F.2d 843, 850 (6th Cir. 1981). Thus, Defendants contend that Plaintiffs' Fifth Amendment claims must be dismissed. Plaintiffs did not address this argument in

17

their brief.  The Court concludes that Defendants are entitled to summary judgment on Plaintiffs'
Fifth Amendment claims.

## C.  Punitive damages are not available against Humphreys County

Plaintiffs seek an award of punitive damages against all Defendants, including Humphreys
County.  (Docket Entry No. 1, Complaint, Prayer for Relief ¶ 3.)  Punitive damages against a local
government are not available under § 1983.  See City of Newport v. Fact Concerts, Inc., 453 U.S.
247, 259-260 (1981).  Plaintiffs did not address this argument in their brief.  The Court concludes
that Defendant Humphreys County is entitled to summary judgment on the issue of punitive
damages.

## D.  Whether Deputy Hedge and Deputy Hogan are entitled to qualified immunity

Deputies Hedge and Hogan have raised the affirmative defense of qualified immunity, which
shields "government officials performing discretionary functions . . . from liability for civil damages
insofar as their conduct does not violate clearly established statutory or constitutional rights of which
a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Once
the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the
officials are not entitled to qualified immunity." Silberstein v. City of Dayton, 440 F.3d 306, 311
(6th Cir. 2006).

The qualified immunity analysis is comprised of two inquiries: first, viewing the facts in the
light most favorable to the Plaintiffs, have the Plaintiffs shown that a constitutional violation
occurred?  Second, was the right clearly established at the time of the violation? Dominguez v.
Correctional Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).  Consideration of these two questions
in sequence is no longer mandatory; the Court may exercise its sound discretion to decide which of

the two questions of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.  Pearson v. Callahan, — U.S. —, 129 S.Ct. 808, 818 (2009).  The Court will begin with the first question: whether the Plaintiffs have shown that a Fourth Amendment violation occurred.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980).  It is undisputed in this case that Mr. Cotham and Ms. Daniel refused to allow Deputies Hedge and Hogan to enter the Cotham residence without a search warrant to look for Mr. Neely and question Mrs. Cotham about the accident.  Deputy Hedge testified at his deposition that he, also, would not allow a law enforcement officer into his home without a warrant.  The "general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it[.]'"  Chimel v. California, 395 U.S. 752, 763 (1969).   Having been denied consent to enter the Cotham home, however, Deputies Hedge and Hogan did not meet with the judicial commissioner to lay out the facts of their investigation to that point in order to establish probable cause for a search warrant for the Cotham residence.  Instead, Deputy Hedge asked the judicial commissioner to issue arrest warrants for obstruction of justice against James Cotham and Erin Daniel, and he did so without any appropriate showing of probable cause to support the arrest warrants.

19

Copies of the two arrest warrants available in the record provide that the warrants were issued under Tenn. Code Ann. § 39-16-602. That statute provides in pertinent part (emphasis added):

> (a) It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, ***by using force against the law enforcement officer or another.***
> * * *
> (c) It is an offense for a person to intentionally prevent or obstruct an officer of the state . . . in serving, or attempting to serve or execute, any legal writ or process.

Reasonably competent public officials, such as Deputies Hedge and Hogan, are presumed to know the law governing their conduct. <u>Harlow</u>, 457 U.S. at 819.

An affidavit underlying the issuance of a warrant must provide information sufficient to establish "a substantial basis for determining the existence of probable cause." <u>United States v. Pruitt</u>, 458 F.3d 477, 480 (6th Cir. 2006) (citing <u>United States v. Leon</u>, 468 U.S. 897, 915 (1984)). In analyzing the warrant, the Court must apply a totality of the circumstances test. <u>Hale v. Kart</u>, 396 F.3d 721, 725 (6th Cir. 2005).

The Court does not know for certain what the Affidavit of Complaint stated with regard to Mr. Cotham's arrest warrant for obstruction for justice, since a copy of the arrest warrant was not included in the record. This is a failure of proof on the part of the Defendants that undermines the support for their motion for summary judgment.

The Affidavit of Complaint included in the arrest warrant for Mr. Cotham for resisting arrest stated: "The Defendant did resist arrest when police attempted to arrest him for obstruction of justice." (Docket Entry No. 12-1.) This affidavit did not provide even minimal information that

would be necessary to determine whether Mr. Cotham violated the statute, either for obstructing justice or for resisting arrest. The Affidavit of Complaint included in the arrest warrant for Erin Daniel for obstruction of justice stated: "The Defendant refused to admit police into her home to talk to her mother who had just returned from the hospital after being in an auto accident. She stated police could not come in to talk to her mother."

Neither affidavit included any facts to establish probable cause that Mr. Cotham or Ms. Daniel used force against Deputy Hedge or Deputy Hogan to prevent them from effectuating their official duties, as the obstruction of justice statute requires. See State v. Corder, 854 S.W.2d 653, (Tenn. Crim. App. 1992). More importantly, taking the facts of the case in the light most favorable to Plaintiffs, Deputies Hedge and Hogan could not have obtained arrest warrants for obstruction of justice because there was no use of force by the Plaintiffs against the law enforcement officers. The Court concludes that Deputies Hedge and Hogan could not have had a good faith belief that the arrest warrants were valid because the arrest warrants were based on bare bones affidavits that failed to establish probable cause for each element of the crime set forth in the obstruction of justice statute. The deputies' reliance on the arrest warrants was thus unreasonable. See Pruitt, 458 F.3d at 480-481; Hale v. Kart, 396 F.3d 721, 724-725 (6th Cir. 2005); Yancey v. Carroll County, 876 F.2d 1238, 1243 (6th Cir. 1989) (noting police officers may rely on judicially secured warrant for immunity from § 1983 action unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable). Cf. Manley v. Paramount's Kings Island, 299 Fed.Appx. 524, 530-531 (6th Cir. 2008). Indeed, a reasonable jury could find that the Affidavit of Complaint contained in the arrest warrant for Erin Daniel reveals conclusively that

21

Deputy Hedge sought the arrest warrant because Ms. Daniel stood on well-established Fourth Amendment rights to require the deputies to secure a search warrant and for no other reason.[7]

When the deputies returned to the Cotham residence with the arrest warrants in hand, they entered the home in order to arrest Mr. Cotham. An "arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603. But here, the arrest warrant for Mr. Cotham was not founded on probable cause.

Further, the Court concludes that the search of the Cothams' home, which included a search of the bedrooms of Mrs. Cotham and her son Travis, could not be justified as a search incident to the arrest of Mr. Cotham, which took place at the door of the home. In Chimel, 395 U.S. at 763, the Supreme Court set the parameters for a search inside a home incident to an arrest based on an arrest warrant. The Court stated:

> There is ample justification . . . for a search of the arrestee's person and the area "within his immediate control"–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

---

[7]Even if the arrest warrants were facially valid, such a circumstance "is not always sufficient to merit summary judgment in an action brought pursuant to § 1983 when evidence exists that a defendant intentionally mislead or intentionally omitted information at a probable cause hearing for an arrest or a search warrant provided that the misleading or omitted information is critical to the finding of probable cause." Voyticky v. Village of Timberlake, 412 F.3d 669, 677 n.4 (6th Cir. 2005). Plaintiffs contend that Deputy Hedge misled the judicial commissioner by failing to reveal that Mr. Neely's mother told Deputy Hedge she picked up her son from the Cotham residence and dropped him off somewhere, but she would not say where.

The record is not precise as to what exactly Deputy Hedge said to the judicial commissioner. While Deputy Hedge's testimony is available, the record does not contain the deposition or affidavit of the judicial commissioner. On the record as it stands, the Court would be hard-pressed to say that there is evidence Deputy Hedge acted out of an intent to mislead the judicial commissioner. Cf. id. ("Plaintiff never alleges, much less offers evidence, that any of Defendants intentionally misled the magistrate or that they omitted material information at the probable cause hearing.")

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs–or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. [footnote omitted] The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

Id. The Supreme Court concluded that the search in question in Chimel exceeded its permissible

scope:

Application of sound Fourth Amendment principles to the facts of this case produces a clear result. The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, "unreasonable" under the Fourth and Fourteenth Amendments[.]

Id. at 768. For the same reasons given by the Supreme Court in Chimel, the Court concludes on the

facts of this case that the movement of law enforcement officers, including Deputy Hedge and

Deputy Hogan, through the Cotham house, beyond the immediate area at the door of the home where

Mr. Cotham might have obtained a weapon to use against the officers, exceeded the scope of a

permissible search incident to arrest. A reasonable officer could not have believed that the officers'

warrantless search in this case was a lawful search incident to arrest based on clearly established law

and the information the officers possessed. Anderson v. Creighton, 483 U.S. 635, 641 (1987).

The Court also concludes that the search of the Cotham residence cannot be justified as a

protective sweep for officer safety, as Deputy Hedge suggested. As defined by the Supreme Court,

"[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted

to protect the safety of police officers and others. It is narrowly confined to a cursory visual

inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327

(1990). The Fourth Amendment permits a protective sweep if the searching officer possessed a

reasonable belief based on specific and articulable facts which, taken together with the rational

inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.  Id.; United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007).

Defendants have produced no evidence that Deputy Hedge or Deputy Hogan held a reasonable belief, based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted them in believing that Mr. Neely was harbored in the Cotham residence and that he posed a danger to the officers or others.  Taking the evidence in a light most favorable to the Plaintiffs, Deputy Hedge spoke to Mr. Neely's mother twice: once at the accident scene and again at her home.  At the accident scene she confirmed that Mr. Neely had been driving the truck and she informed Deputy Hedge she was on the way to the Cotham residence to pick up Mr. Neely.  Later, when Deputy Hedge visited her home, Mr. Neely's mother admitted that she picked up her son from the Cotham residence and dropped him off at another location, but she would not say where.  This was in direct contravention of Deputy Hedge's direction to her to stay at the Cotham residence with Mr. Neely or return him to the accident scene.  Mr. Neely's parents gave Deputy Hedge permission to search their residence for Mr. Neely, but Deputy Hedge did not search the residence because he took the parents at their word that Mr. Neely would not be found there.  Yet, Deputy Hedge and Deputy Hogan did not provide any specific, articulable facts to show why their belief that Mr. Neely was still present at the Cotham residence was a reasonable belief.

Further, Defendants have produced absolutely no evidence that Mr. Neely posed any danger to law enforcement officers if and when he was located.  There is no evidence that he carried a weapon or that he had a violent history.  There is no evidence that Mr. Neely had access to weapons

even if he was hiding in the Cotham residence. The deputies knew Mrs. Cotham was inside the residence, but according to Plaintiffs, the deputies knew Mrs. Cotham had taken narcotics and was sleeping. Thus, in her condition, she would not be likely to pose a danger to the deputies. Thus, Deputy Hedge and Deputy Hogan failed to identify specific and articulable facts establishing that Mr. Neely was harbored in the Cotham residence and that he, or anyone else inside the residence, posed a danger to the officers or others.

Without such a showing, there was no basis for a protective sweep. No reasonable deputy could have believed on these facts, under clearly established law, that justification existed for a protective sweep. Considering all of the facts and reasonable inferences, Plaintiffs have produced sufficient evidence for a jury to reasonably determine that the arrest of Mr. Cotham and the "protective sweep" of the Cotham residence was simply a ruse for the deputies to look for Mr. Neely and speak to Mrs. Cotham about the accident, even though the deputies did not have sufficient probable cause to obtain a search warrant.

Taking the facts in a light most favorable to Ms. Daniel, the deputies pulled her out of her apartment, arrested her, and handcuffed her outside her apartment door. A lawful search incident to her arrest would have been confined to the immediate area surrounding her outside the apartment to keep her from obtaining any weapon that could be used on the deputies. Defendants have not provided sufficient justification to obtain summary judgment on the deputies' decision to enter Ms. Daniel's living room and dining room under the guise of a search incident to arrest. See Chimel, 395 U.S. at 768. There is also no proof that a protective sweep was necessary as there were no specific and articulable facts provided to show that Ms. Daniel or her roommate posed any danger to law enforcement. See Buie, 494 U.S. at 327.

25

Finally, even if Deputy Hedge and Deputy Hogan were facing a statutory four-hour deadline for investigating and bringing a charge against Mr. Neely for DUI, exigent circumstances would not have permitted them to arrest Mr. Cotham and Ms. Daniel and search their homes. "Exigent circumstances are present as a matter of law (1) to engage in hot pursuit of a fleeing felon; (2) to prevent the imminent destruction of evidence; (3) to prevent a suspect from escaping; and (4) to prevent imminent harm to police or third parties." U.S. v. Washington, 573 F.3d 279, 287 (6th Cir. 2009). Even if the deputies wanted to subject Mr. Neely to field sobriety tests or a blood alcohol test or prevent Mr. Neely from escaping, the deputies had adequate time to secure a search warrant for the Cotham residence, instead of requesting arrest warrants for Mr. Cotham and Ms. Daniel. Defendants have not provided any reasonable explanation why the deputies did not seek a search warrant. Therefore, the Court concludes that there was not a "true immediacy" that absolved the deputies from applying for a search warrant. See id. at 288.

For all of these reasons, the Court concludes that Deputy Hedge and Deputy Hogan are not entitled to the qualified immunity defense. Therefore, these Defendants are not entitled to summary judgment in their individual capacities.

**E. Claims against Sheriff Davis and the County**

Plaintiffs seek to hold Sheriff Davis liable for his failure to supervise or train the deputies. A supervisor may not be held liable under § 1983 solely on a theory of *respondeat superior*. Bennett v. City of Eastpointe, 410 F.3d 810, 818 (6th Cir. 2005). Plaintiffs must show that Sheriff Davis implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate. See id.; Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (noting

26

supervisory liability attaches when supervisor encourages, condones or participates in constitutional violation).

Plaintiffs' evidence against Sheriff Davis is very thin. Mr. Cotham testified that Sheriff Davis did not call him promptly after he complained about the deputies' behavior and that Sheriff Davis apologized to him after the charges were dropped. At that time, Sheriff Davis also explained that he should have taken care of the matter earlier and that he "chewed out" the deputies. Even taking this evidence in the light most favorable to Plaintiffs, it is no more than a scintilla of evidence that is insufficient to defeat the motion for summary judgment. See Anderson, 477 U.S. at 252. Plaintiffs must produce evidence on which a jury could reasonably find in their favor against Sheriff Davis for failing to train or supervise his deputies, but they have not done so. Plaintiffs produced no evidence concerning the training the deputies do or do not receive, other than a general reference to their basic academy training leading to POST certification, and they produced no evidence that Sheriff Davis failed to supervise his deputies on the night in question. Because Plaintiffs did not create a jury question as to the liability of Sheriff Davis, the Court concludes that Sheriff Davis is entitled to summary judgment in his official and individual capacity.

As to Humphreys County, "the Supreme Court has explained that '[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Brooks v. Rothe, 577 F.3d 701, 712 (6th Cir. 2009) (quoting Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978)). Municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. Pembaur v. City of Cincinnati, 475 U.S. 469, 480

27

(1986). "Such municipal liability attaches where 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" Brooks, 577 F.3d at 712 (citing Pembaur, 475 U.S. at 481).

While Plaintiffs have established that Sheriff Davis had final authority to make policy for the Sheriff's Office, Plaintiffs have not shown that Sheriff Davis ordered or participated in any of the conduct of his deputies that is at issue, nor have Plaintiffs shown any policy, ordinance, regulation, decision or custom that was the moving force behind the constitutional violations asserted here. City of Canton v. Harris, 489 U.S. 378, 388 (1980). At most Plaintiffs show that the Sheriff's Office did not have a written policy manual in 2007. But the lack of a written policy manual says nothing about whether there were oral policies and customs followed in the Sheriff's Office that were the moving force behind the events at issue. Because Plaintiffs have not produced sufficient evidence on this point, Humphreys County's motion for summary judgment will be granted.

Plaintiffs' suit against Deputies Hedge and Hogan in their official capacities is, in essence, a suit against Humphreys County, and for the same reasons the County is entitled to summary judgment, Deputies Hedge and Hogan are entitled to summary judgment in their official capacities. See Cady v. Arenac County, 574 F.3d 334, 342 (6th Cir. 2009).

## IV. **CONCLUSION**

In summary, Deputies Hedge and Hogan are entitled to summary judgment in their official capacities, but they are not entitled to qualified immunity in their individual capacities. The arrest warrants they obtained for James Cotham and Erin Daniel were facially invalid as a matter of law, and the deputies could not in good faith reasonably rely on the arrest warrants to effectuate the

28

arrests of Mr. Cotham and Ms. Daniel. Further, the searches of the Cotham residence and the Daniels apartment could not be justified by theories of search incident to arrest, protective sweep, or exigent circumstances.

Plaintiffs did not present sufficient evidence to proceed against Sheriff Davis in his official and individual capacities for failure to supervise and/or train his deputies. Thus, his motion for summary judgment will be granted.

Plaintiffs did not establish a policy or custom in order to hold Humphreys County liable under Monell. Thus, the County's motion for summary judgment will be granted.

Finally, Defendants are entitled to summary judgment on Plaintiffs' claims under the Fifth and Fourteenth Amendments (to the extent the Fourteenth Amendment claims rest on substantive due process) and for punitive damages against Humphreys County.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE